**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CLAYTON COLLINS,**

     **Plaintiff,**

**v.**                                    **Case No. 3:10-cv-00414**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

     **Defendant.**

**<u>MEMORANDUM OPINION</u>**

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. (Docket No. 2). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 9 and 10). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 15 and 20).

**I.**   **<u>Procedural History</u>**

Plaintiff, Clayton Collins (hereinafter "Claimant"), applied for DIB benefits on June 11, 2007, alleging disability beginning February 21, 2007 due to a "back problems, heart problems, and high blood pressure." (Tr. at 11 and 141). The application was denied initially and upon reconsideration. (Tr. at 11). Thereafter, Claimant requested an administrative hearing, which was held on November 20, 2008 before the Honorable

James A. Quinlivan, Administrative Law Judge (hereinafter the "ALJ"). (Tr. at 44-70). The ALJ held a supplemental hearing on April 17, 2009 to consider additional medical information.  (Tr. at 22-43).  By decision dated July 23, 2009, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 11-21).

The ALJ's decision became the final decision of the Commissioner on January 29, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).  On March 30, 2010, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties have filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 11, 12, 15 and 20).  Therefore, the case is ripe for resolution.

## II.   <u>Summary of the ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability.  See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims.  If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied.  20 C.F.R. § 404.1520.  The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment.  *Id.* § 404.1520(b).  If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment.  *Id.* § 404.1520(c).  If severe impairment is present, the third inquiry

is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits. However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second,

the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ determined, as a preliminary matter, that Claimant met the insured status requirements of the Social Security Act through December 31, 2011. (Tr. at 13, Finding No. 1).  The ALJ found that Claimant satisfied the first step of the sequential evaluation because he had not engaged in substantial gainful activity since the date of the alleged onset of disability. (Tr. at 13, Finding No. 2).  Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of degenerative disc disease and bulging discs of the lumbar spine; bulging disc of the cervical spine; chronic pain syndrome; coronary artery disease, and diminished vision and hearing.  He further determined that Claimant had non-severe impairments of

shortness of breath; irritable bowel syndrome; gastrointestinal reflux disease; knee impairment; and psychological disorder. (Tr. at 13-15, Finding No. 3). At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment included in the Listing. (Tr. at 15, Finding No. 4). The ALJ then found that Claimant had the following residual functional capacity:

> [L]ight work as defined in 20 C.F.R. 404.1567(b) except to lift and/or carry 20 pounds occasionally (1/3) and ten pounds frequently (2/3); stand/walk 4 hours out of an 8 hour workday, 1 hour at a time (maximum 2 hours a day); sit 4 hours out of an 8 hour workday, 2 hours at a time; occasionally push/pull with lower extremities; no sustained or frequent overhead work; no climbing hills or slopes or work on uneven terrain; no climbing high ladders or working at unprotected heights; only occasionally climb stairs, steps, or ramps; only occasionally bend or stoop, crouch, or kneel; never prolonged or full squat or crawl; no working in the vicinity of heavy moving machinery or otherwise exposure to excessive floor vibrations; no operation of mobile equipment or otherwise exposed to jarring, jostling, or jolting; no commercial vehicle driving; occasionally operate a foot pedal controlled equipment; no exposure t0 extreme cold or hot temperatures; no work in damp or humid conditions; and permitted to wear corrective eyeglasses or hearing aids as desired.

(Tr. at 15-19, Finding No. 5).

As a result, Claimant could not return to his past relevant employment as a railroad heavy equipment operator/cleaning laborer, which was considered medium to heavy, semi-skilled work. (Tr. at 19, Finding No. 6). The ALJ considered that Claimant was 51 years old at the time of the disability onset date, which defined him as an "individual closely approaching advanced age," and that he had a high school education and could communicate in English. (Tr. at 20, Finding Nos. 7 and 8). The ALJ noted that transferability of skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of whether Claimant had transferable job skills. (*Id.*, Finding No. 9). In view of these factors and based on the evidence of record and a vocational expert's testimony, the ALJ concluded that Claimant could

perform jobs such as nongovernmental mail clerk; office helper; cashier; routing clerk; retail order clerk; and surveillance system monitor, all of which existed in significant numbers in the national and regional economy. (Tr. at 20-21, Finding No. 10). On this basis, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act.  (Tr. at 21, Finding No. 11).

## III.   Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001).  The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As such, the Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.*  The Court's obligation is to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind

that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

A careful review of the record reveals that the decision of the Commissioner is supported by substantial evidence.

## IV.   Claimant's Background

Claimant was born in 1955 and was 53 years old at the time of his second administrative hearing. (Tr. at 20). He was a high school graduate and could speak and read English. (Tr. at 20). In the years preceding his alleged onset of disability, Claimant was employed as a semi-truck driver for businesses that cleared train wrecks. (Tr. at 142). He terminated employment after sustaining a back injury at work. (Tr. at 141).

## V.   Relevant Medical Evidence

The Court reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence.   To the extent that the Claimant's medical treatment and evaluations are relevant to the issues in dispute, the Court summarizes them as follows:

### A.  Summary of Treatment

On February 22, 2007, Claimant presented to the Emergency Department ("ED") at St. Mary's Medical Center ("SMMC") complaining of back pain that had been worsening over the prior two months and was more acute with jarring and movement. (Tr. at 242-246).   Because of his history of acute myocardial infarctions, which culminated in stent placement in 2005, the ED physician consulted with a cardiologist. Upon examination, the cardiologist concluded that Claimant's pain was likely caused by herniated discs, but decided to observe Claimant for signs of an impending heart attack. *(Id.)*.  Claimant was discharged on February 23, 2007 and given a referral to the pain

clinic (Tr. at 362).

On March 13, 2007, Claimant returned to the ED at SMMC complaining of chest and upper back pain for the past three weeks.  (Tr. at 378-380).  He reported to the ED physician that he had a history of chronic upper and lower back pain due to degenerative disc disease. He explained that he had been in the ED in February for chest and back pain and was discharged.  Claimant had returned to work earlier that day and began to suffer chest pain while driving a semi-truck.  (*Id.*). He contacted his family physician, Dr. Gilberto Garza, who instructed Claimant to go to the ED.  Claimant was admitted to observation by the ED physician to rule out myocardial infarction. (*Id.*). Claimant was evaluated by a cardiologist the following day, who felt that Claimant's pain was non-cardiac and probably related to his disc disease.  The cardiologist noted that Claimant was "unwilling to listen to any of my opinions at this time," adding that Claimant was very demanding and stated that "he is not leaving the hospital until he has left catheterization performed." (Tr. at 381-383).  Accordingly, later that day, Dr. Paulette Wehner performed a left coronary catheterization.  (Tr. at 263-264).  She found Claimant's stents to be patent and recommended that he follow aggressive risk modification and pursue exploration of non-cardiac causes of chest pain.  (*Id.*).

After discharge from the hospital, Claimant presented to Dr. Garza's office for evaluation of his back and chest pain.  (Tr. at 631).  Bearing in mind that Claimant's recent catheterization ruled out a cardiac origin for the pain, Dr. Garza surmised that Claimant's symptoms were stemming from his cervical or dorsal (thoracic) spine and were related to an injury he suffered at work on February 21, 2007, when he wrenched his back helping to change a flat tire.  (*Id.*).   Dr. Garza ordered an MRI of Claimant's cervical and dorsal spine.  The MRI was completed on April 19, 2007 and revealed an

asymmetrical right-sided disc bulge with osteophyte formation at the C5-6 level of the cervical spine, as well as multilevel vertebral endplate developmental changes without evidence of disc herniation or cord impingement in the thoracic spine.  (Tr. at 476-478).  Based upon these films, Dr. Garza referred Claimant to Dr. David Weinsweig, a neurosurgeon.  (Tr. at 288-289).

On May 2, 2007, Dr. Weinsweig examined Claimant.  In a letter to Dr. Garza regarding the examination, Dr. Weinsweig indicated that Claimant was suffering from pain "which is hard to fully explain based upon the testing we have thus far."  (*Id.*).  He opined that the MRI findings were not overly severe and did not explain the symptomatology.  Claimant displayed no acute distress when asked to do straight leg raising and hip rotations.  All signs of muscle wasting, atrophy, or neurological impingement were negative.  (*Id.*). Dr. Weinsweig recommended a bone scan, MRI of the lumbar spine, and EMG/nerve conduction studies of the lower extremities.  (*Id.*).  In the interim, Dr. Weinsweig also referred Claimant to Dr. Allen Young.  (Tr. at 301-304).

On May 15, 2007, Dr. Young performed his initial evaluation of Claimant.  (*Id.*).  He described Claimant's primary problems as neck and lower back pain. Claimant denied radiation of the pain, but complained of numbness, tingling and burning in his feet that worsened with sitting.  He denied treatment by a pain management specialist, but reported that he had been taking Lortab for the pain.  (*Id.*).  Dr. Young diagnosed a soft tissue injury and recommended physical therapy, a lumbar MRI, a bone scan, nerve conduction studies, and a low dose short course of steroids.  Claimant requested that Dr. Young assume care as his primary treating physician and a transfer of care form was completed.  (*Id.*).

On May 16, 2007, Claimant underwent a lumbar spine MRI.  The MRI revealed stable minimal disc bulges from T12/L1 through L3-4; a mild disc bulge at L4-5 with internal development of a posterior annular tear; and a protruding disc bulge/ herniation at the L5-S1 showing contact the left S-1 nerve root and the L-5 post ganglionic nerve root. (*Id.*). The radiologist recommended clinical correlation for radiculopathy.  That same day, Claimant was evaluated by a physical therapist, who recommended therapy sessions three times each week for six weeks.  (Tr. at 306). Unfortunately, the physical therapy sessions did not improve Claimant's condition.  (Tr. at 307, 310-312).  The therapists noted that Claimant had "poor tolerance to exercise" and "increased discomfort after traction."  (*Id.*).

Claimant returned to Dr. Young's office on May 25, 2007.  (Tr. at 313-315).  By this time, Claimant had undergone a bone scan, which was negative.  (Tr. at 252).  Dr. Young commented that Claimant's pain was worse and the symptoms in his lower extremities persisted.  (*Id.*).  Dr. Young saw Claimant again on June 4, June 18, July 17, and September 7, 2007 with no improvement in his condition.  (Tr. at 316-318, 320-322, 324-326, and 507-509).  During this period, Claimant also completed nerve conduction studies administered by Dr. Weinsweig, which were negative. (Tr. at 299).   Dr. Weinsweig wrote Dr. Garza on July 11, 2007 and suggested that Claimant be referred to a pain clinic for evaluation and treatment.  (Tr. at 287).

On August 30, 2007, Claimant presented to Dr. David Caraway, Medical Director of Tri-State Center for Pain Relief. (Tr. at 461-462). Dr. Caraway wrote to Dr. Young regarding his evaluation of Claimant. (*Id.*). Dr. Caraway noted that Claimant was neurologically "completely intact," although he did appear to have some radicular features. For that reason, Dr. Caraway suggested some possible therapies to reduce his

pain.   However, according to Dr. Caraway, Claimant had unrealistic expectations, requesting stronger pain medications to get him to "zero pain."  Claimant refused to consider other interventions, such as injections, to address his pain.  As a result, Dr. Caraway concluded that he had nothing further to offer Claimant.  (*Id.*)

Claimant next saw Dr. Young on September 14, 2007.  He reported that his new medication, Percocet, did help relieve his symptoms.  (Tr. at 510-512).  Dr. Young noted that Claimant was not a surgical candidate and had refused injections.  In addition, he was unable to tolerate physical therapy.  Therefore, Dr. Young increased Claimant's dosage of Percocet to help with break-through pain.  He also ordered a repeat MRI of the lumbar spine.  (*Id.*).  The increased dose of medication did provide additional relief, although Claimant continued to have symptoms in his lower extremities.  (Tr. at 514-515).

Dr. Young examined Claimant again on October 8, November 5, and December 27, 2007, and January 31, 2008.  (Tr. at 518-519, 597-599, 558-560 and 562-564).  On these visits, Claimant reported that without medication, his pain was 9/10, and with medication, it ranged between a 5-6/10.  Dr. Young suggested evaluation by a pain management specialist, and Claimant asked to be referred to someone other than Dr. Caraway.  (*Id.*).

On February 6, 2008, Claimant's wife presented to Dr. Young's office and told him she was "at her wit's end."  (Tr. at 565-566).  She reported that Claimant's pain was extreme and Percocet did not really control it.  She indicated that Claimant was apprehensive about seeing another pain medicine specialist, because he did not want to receive injections.  Dr. Young recommended a second opinion from a neurosurgeon and to consider consultation with a chiropractor.  In the meantime, Dr. Young switched

Claimant's pain medicine to a Duragesic patch to see if that would provide better pain control.

Claimant returned on February 20, 2008 and advised Dr. Young that the Duragesic patch had provided him with considerable relief.  (Tr. at 568-570).  He complained that the patch made him a little nauseous and drowsy, so Dr. Young lowered the dose. (*Id.*).  On March 4, 2008, Claimant reported that the patch worked well although it only lasted two days instead of three.  (Tr. at 371-373).  On March 12, 2008, Dr. Young considered increasing the dosage, but decided to wait a while longer.  (Tr. at 574-576.  He also noted that Claimant was showing signs of clinical depression and recommended consultation with a psychiatrist. (*Id.*).  On April 4, 2008, Dr. Young increased the dosage of the patch, but then decreased it some three weeks later when Claimant complained that the patch caused itching.  (Tr. at 577-579).  On May 5, 2008, Claimant indicated that Claimant was very pleased with the dosage of the patch.  (Tr. at 580-581).  He indicated that he had no side effects and pain control was very good. (*Id.*).  Claimant continued to respond well to the patch, reporting good control during his next three visits in May, June, and July 2008.  (Tr. 582-587).

On August 18, 2008, Claimant reported that he continued to have good pain control from the patch, although he had felt some worse since participating in an independent medical examination at the request of the Disability Determination Services ("DDS").  (Tr. at 588-589).  Dr. Young decided to add a short course of steroids to Claimant's medication regimen.  (*Id.*).  Claimant reported to Dr. Young at his next visit on September 18, 2008 that the steroids had helped, and he was "back to his usual level of discomfort." (Tr. at 591-592).  Claimant maintained this level of relief, indicating in a November 2008 visit that "the duragesic has helped tremendously with [his daily

pain] and he is able to do a bit more in general around the house and tolerate the pain alot more." (Tr. at 677).

During this period of Claimant's success with the Duragesic patch, Dr. Young completed a residual functional capacity evaluation at Claimant's request.  (Tr. at 553).  On October 29, 2008, Dr. Young opined in the evaluation that Claimant could occasionally carry less than 10 pounds; could stand, sit and walk less than two hours each in an eight hour workday, and, then, only if he was able to alternate every 15 to 20 minutes; could never climb, stoop, crouch or crawl; only occasionally balance and kneel; and needed to avoid extreme cold, vibrations, and environmental hazards such as machinery and heights.  (*Id.*).

At a December 29, 2008 visit with Dr. Young, Claimant complained that he was experiencing more pain and requested an increased dosage of Duragesic patch.  (Tr. at 679-680).  Dr. Young was resistant to increasing the dose and suggested that Claimant's care be transferred to a pain management specialist.  Dr. Young also recommended a second opinion from a neurosurgeon, documenting that he had previously scheduled a second opinion, but Claimant failed to keep the appointment on the advice of his lawyer. (*Id.*).  Claimant's condition was essentially the same at his January and February 2009 visits with Dr. Young. (Tr. at 681-685).

On March 6, 2009, Dr. Young again raised the issue of transferring Claimant's care to a pain management specialist.  (Tr. at 687-688).  Claimant advised Dr. Young that he had gone to see Dr. Ahmet Ozturk at the Cabell Huntington Hospital Pain Clinic.  According to Claimant, after he had submitted to a battery of tests, Dr. Ozturk told Claimant that "he didn't know what to do" for him.  (*Id.*).   Dr. Young noted that he would continue to write Claimant a prescription for the patch until Dr. Ozturk's formal

report became available.  Dr. Young had not received the report by the April 2009 visit, so he wrote another prescription for Claimant.  (Tr. at 690-691).  On June 26, 2009, Dr. Young wrote a letter "to whom it may concern," indicating that Claimant had struggled with a work-related injury and would need to be off work indefinitely.  (Tr. at 694).

### B.    Worker's Compensation and SSA Evaluations

On June 19, 2007, Dr. Luis A. Loimil examined Claimant at the request of the Worker's Compensation carrier.  (Tr. at 396-418).  The examination was limited to Claimant's complaints of "back ache, unspecified."  Dr. Loimil noted that Claimant drove himself to the appointment, but reported that he could only drive a maximum of an hour at a time and experienced an increase in low back pain when he drove.  (Tr. at 396-397).  Dr. Loimil reviewed the history of Claimant's back problems, as well as his medical and social history.  He noted under activities of daily living that Claimant could perform his own self care and prepare foods, but was limited in his ability to complete yard work or engage in recreational activities.  (Tr. at 401).  Dr. Loimil performed a comprehensive examination of Claimant's musculoskeletal system, concluding that Claimant had not reached maximum medical improvement at the time. (Tr. at 401-405).  Accordingly, Dr. Loimil did not rate Claimant's whole person impairment.  (*Id.*).

On August 27, 2007, SSA consultant, Dr. Cindy Osborne, completed a Physical Residual Functional Capacity Assessment form.  (Tr. at 452-459).  She found, based upon a review of the medical evidence, that Claimant could lift 20 pounds occasionally and 10 pounds frequently; he could sit, stand and walk about 6 hours, each, during an 8-hour workday, although he did have to periodically alternate positions for comfort.  Dr. Osborne identified some postural and environmental limitations, but found no manipulative, visual, or communicative limitations.  (*Id.*).   She opined that Claimant's

credibility was "partial," because the extent of his alleged disabilities exceeded that associated with his documented impairments.

Dr. Rogelio Lim completed a second Physical Residual Functional Capacity Evaluation form at the request of the SSA on October 16, 2007.  (Tr. at 522-529).  Dr. Lim evaluated Claimant as having the same exertional limitations found by Dr. Osborne. He concluded that Claimant had a few additional postural limitations, but otherwise, his overall assessment was similar to that of Dr. Osborne.  (*Id.*).

On December 12, 2008, between Claimant's two administrative hearings before the ALJ, Dr. Drew Apgar performed a thorough physical evaluation of Claimant at the request of the SSA.  (Tr. 647-675).  Dr. Apgar reviewed portions of Claimant's medical records and MRI films and obtained a history from Claimant regarding his medical issues, which Claimant described as chronic pain of the lumbar spine, coronary problems, and hypertension.  On physical examination, Dr. Apgar noted that Claimant could get off and on the examining table without difficulty; showed good posture; could dress and undress without assistance; and was able to move around the room without difficulty. (Tr. at 652).  Dr. Apgar indicated that Claimant had a steady gait and could ambulate without the assistance of appliances or aids.  (Tr. at 656).  Claimant was able to heel walk, toe walk, squat and rise, and do seated straight leg raising without difficulty.  His muscle strength was equal bilaterally, and his upper extremities were entirely normal, with fine coordination, pinch, and manipulation intact.  (Tr. at 659). However, Claimant had significant compromise in range of motion testing. In his assessment, Dr. Apgar indicated that Claimant should have no difficulty with standing, walking, sitting, hearing, speaking, traveling, lifting, carrying, pushing, pulling or handling objects with his dominant hand.  (Tr. at 561).   He observed that the results of

Claimant's range of motion testing were inconsistent with dynometer testing, which suggested that Claimant's function was actually normal rather than significantly compromised.  Accordingly, Dr. Apgar felt that Claimant's range of motion testing was unreliable.  (*Id.*).

## VI.   **Claimant's Challenges to the Commissioner's Decision**

Claimant's challenges can be divided into two broad categories.   The first category generally involves the ALJ's assessment of Claimant's pain.  Claimant contends that the ALJ erred by discounting his complaints of pain and by improperly concluding that he was not fully credible when describing the limitations associated with his pain.[1] (Pl. Br. at 15-17).  The second category of challenges pertains to the ALJ's treatment of the medical source opinions of Dr. Young, Claimant's treating physician. In particular, Claimant asserts that the ALJ erroneously discredited the residual functional capacity assessment prepared by Dr. Young, (Pl. Br. at 11), and refused to acknowledge that Dr. Young's opinion gave rise to the unequivocal finding that Claimant's impairments medically equaled a listed impairment. (Pl. Br. at 17-19).

In response, the Commissioner argues that the ALJ carefully evaluated and considered the totality of the evidence and reached a decision that is supported by substantial evidence.  According to the Commissioner, the ALJ (1) properly analyzed Claimant's credibility using the requisite two-step process; (2) fully developed the record relevant to the crucial issues; (3) provided a sound basis for rejecting Dr. Young's RFC opinion; and (4) correctly compared Claimant's combination of impairments to the

---

[1] Claimant also argues that the ALJ failed to fully develop the record in regard to Claimant's pain; however, that argument essentially restates the criticism that the ALJ incorrectly evaluated Claimant's credibility relating to his pain-induced limitations.  Claimant does not otherwise point to the absence of any specific information.

Listing to ascertain medical equivalency.  (Def. Br. at 12-20).

Having thoroughly considered the evidence and the arguments of counsel, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## VII.   Analysis

### A.    The ALJ's Consideration of Claimant's Credibility and Pain

Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, to determine their limiting effects on a claimant. *See* 20 C.F.R. § 404.1529.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms.  SSR 96-7P.  Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in the case record.  *Id.*

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to

determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *See Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulation, case law, and Social Security Ruling and was supported by substantial evidence. 20 C.F.R. § 404.1529; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Significant evidence existed in the record that Claimant's complaints of pain did not correlate with his reported level of activity, his perceived functional abilities, and his objective medical records.

As stated in his written decision, the ALJ found that Claimant suffered from medically determinable impairments that could reasonably be expected to produce his complaints of pain; thus, he assessed Claimant's credibility. The ALJ concluded that Claimant's statements as to the intensity, persistence, and limiting effects of his alleged disabilities, separately and in combination, were not credible, because they were inconsistent with the pertinent records in evidence. For instance, the ALJ noted that Claimant complained of severe and constant back pain, yet told his treating physician that his pain had decreased significantly with use of Duragesic patches, allowing him to participate in activities around the house. Claimant reported using a weed eater, picking vegetables from his garden and canning them, and performing household chores, such as dusting, vacuuming, and laundry. (Tr. at 18). In addition, the ALJ

commented that although Claimant alleged disabling depression and coronary insufficiency, he received minimal treatment for these conditions. (*Id*). Finally, although not explicitly referenced by the ALJ, the report prepared by Dr. Apgar, which contained the most current physical evaluation of Claimant, substantiated the ALJ's impression that Claimant's testimony was not entirely credible.  In his written report, Dr. Apgar opined that Claimant's range of motion testing was unreliable, because the complaints of pain and limitation offered by Claimant during the testing were inconsistent with objective dynometer readings that were essentially normal. The extent of the inconsistency suggested to Dr. Apgar that Claimant manipulated the subjective component of the range of motion test to make his pain-induced limitations appear more severe and disabling than they were when objectively measured.

Having scrutinized the ALJ's decision and the evidence in its totality, the Court finds that the ALJ thoroughly considered Claimant's complaints of pain and conducted a proper review of the evidence to assess Claimant's credibility.  Consequently, the ALJ's ultimate finding in that regard has substantial evidentiary support.

### B.    Medical Source Opinion of Dr. Young

Claimant next alleges that the ALJ failed to follow the social security regulations and case law in the weight he afforded the functional capacity evaluation prepared by Dr. Young, Claimant's treating physician. (Pl.'s Br. at 11).   On October 29, 2008, Dr. Young completed a residual functional capacity evaluation at Claimant's request, placing severe restrictions on Claimant's exertional and non-exertional functions.  (Tr. at 553). On June 26, 2009, Dr. Young wrote a follow-up letter "to whom it may concern," indicating that Claimant had struggled with a work-related injury and "is not able to work and at this point will be off work indefinitely."  (Tr. at 694).

In his decision, the ALJ explicitly rejected Dr. Young's opinions as being non-persuasive, explaining as follows:

> The undersigned notes that Dr. Young did not set forth his reasons for this residual functioning capacity assessment (Exhibit 21F). Further, the undersigned notes that in treatment records Dr. Young reported the claimant has only mild objective findings that include negative straight leg raise testing, tenderness of the lumbar and thoracic spinal regions, normal gait, decreased range of motion of the lumbar and cervical spinal regions, and mild weakness of the feet (Exhibits 4F, 5F and 22F). As a result, the undersigned gives little weight to the above residual functional capacity assessment.

(Tr. at 19).

In evaluating the opinions of medical sources, the Commissioner generally gives more weight to the opinion of a claimant's treating physician, who is often most able to provide "a detailed, longitudinal picture" of the claimant's alleged disability. *See* 20 C.F.R. § 404.1527(d) (2). Nevertheless, a treating physician's opinion is allotted **controlling weight** "only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater,* 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also* 20 C.F.R. § 404.1527(d)(2). The opinion of a treating physician must be weighed against the record as a whole when determining its consistency with the evidence. 20 C.F.R. § 404.1527(d)(2).

20 C.F.R. § 404.1527 details the process by which the SSA will consider medical source opinions in deciding whether a claimant is disabled. According to 20 C.F.R. § 404.1527(d), "[r]egardless of its source, we [the SSA] will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2), we consider all of the following factors in deciding the weight we give to any medical opinion." Consequently, if the ALJ determines that a treating physician's

opinion should not be given controlling weight, the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(d) in weighing all of the medical opinions, including those of the treating physician.  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight is given to an examiner than to a non-examiner.  Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, by extension, than to non-examining sources). Section 404.1527(d)(2)(i) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given.  Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Ultimately, it is the responsibility of the Commissioner, not the Court, to review the case, make findings of fact, and resolve conflicts of evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Court's role is limited to analyzing the record as a whole to determine whether the Commissioner's conclusions are rational.  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1994).

After reviewing the opinion of Dr. Young and the ALJ's written decision, the Court is of the opinion that the ALJ fully complied with the applicable regulations and rulings in his treatment of Dr. Young's evaluation and opinions.   The ALJ found that Dr. Young's RFC assessment plainly fell short in terms of supportability and consistency.  The Court agrees with this finding.  The ALJ compared the limitations noted by Dr. Young with his office records and the objective clinical findings and determined that the contemporaneous medical records did not support the severity of restriction indicated by Dr. Young.  Most persuasive to the ALJ was the lack of any notations in Dr. Young's records documenting objective evidence of limitations that were more severe than "mild."

Regarding Dr. Young's opinion that Claimant was unable to work, the ALJ acted within his discretion to disregard it.   SSR 96-5p.  Social Security Ruling 96-5p states: "Under 20 CFR 404.1527(e) and 416.927(e), some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." An example of such an issue is "[w]hether an individual is 'disabled' under the Act." *Id.* "The regulations provide that the final responsibility for deciding issues such as [whether an individual is disabled] is reserved to the Commissioner." *Id.* Therefore, the ALJ was required to consider Dr. Young's opinion that Claimant was unable to engage in any work activity, an issue reserved to the Commissioner, to the extent required by SSR 96-5p:

> If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

SSR 96-5p.  As noted above, the ALJ analyzed the evidence in its totality and concluded that the objective findings did not support the extent of the restrictions identified by Dr. Young.  Further, the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms was not sufficiently strong to substantiate a finding of disability.

The ALJ expressly adopted the function-by-function assessment of the agency consultant and examiners, finding that Claimant was restricted to light level exertional work.  (Tr. at 19).  Certainly, none of these physicians suggested that Claimant was without severe impairment or that he could return to his prior relevant work.  Instead, they opined that he had specific exertional and non-exertional restrictions that allowed him to perform work the ALJ defined as light exertional with additional non-exertional restrictions. Taking all of Claimant's limitations into account, the ALJ prepared a detailed and individualized RFC that adequately represented the nature and extent of Claimant's limitations.  The ALJ accepted that Claimant was unable to perform past relevant work and moved to the final step of the sequential evaluation.

At this step, the ALJ acknowledged that Claimant had established a *prima facie* case of disability, shifting the burden to the Commissioner to produce evidence that Claimant was still able to perform other forms of substantial gainful activity, even when taking into account his remaining physical and mental capacities, age, education, and prior work experiences.  20 C.F.R. §§404.1520(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous

work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 404.1569.  However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform.  *Id.*  For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs.  *Id.*  In those cases, the ALJ must prove the availability of jobs through the testimony of a vocational expert.  *Id.*  As a corollary to this requirement, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant so long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. See *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

Here, the ALJ recognized that Claimant's impairments resulted in a combination of exertional and nonexertional impairments.  Therefore, he properly relied upon the testimony of a vocational expert in determining that jobs existed in significant numbers in the national economy that Claimant could perform.  (Tr. at 20-21).  Claimant makes no argument that the vocational expert was not qualified to render opinions, or that his opinions were based upon incomplete or inaccurate hypothetical questions.  Indeed, the vocational expert was present throughout both administrative hearings and had the opportunity to listen to Claimant's descriptions of his medical conditions and their resulting functional limitations.  Despite the totality of Claimant's restrictions, the vocational expert found light and sedentary exertional level positions that Claimant

could perform. (Tr. at 36-40).    In view of these circumstances, the Court finds that the ALJ fulfilled his obligation to produce expert testimony on the subject of job availability individualized to the Claimant.   Consequently, the decision of the Commissioner that Claimant was not under a disability is supported by substantial evidence.

On the issue of medical equivalency, Claimant argues that his impairments, when combined, unequivocally rise to the level of an impairment outlined in the Listing. However, he provides no particular basis for this conclusion, nor identifies which listed impairment is applicable to his case.   In contrast, the ALJ thoroughly reviewed Claimant's severe and non-severe impairments and compared them, in combination, to several applicable listings; however, Claimant lacked the essential criteria to meet any of the relevant listings.   Undoubtedly, the ALJ was required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity."  *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity.  *Id.*  The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed.  *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).   In fact, the ALJ performed this analysis. (Tr. at 15).

Moreover, in addition to considering whether Claimant's impairments were medically equivalent to a listed impairment, the ALJ incorporated these limitations into Claimant's RFC.  The ALJ determined that Claimant was exertionally able to perform work within the light range, and then further restricted the RFC by including additional postural and environmental limitations reflective of those that were substantiated by the medical records.  (Tr. at 15-19).  The ALJ provided a clear and detailed explanation of the evidence, both documentary and testimonial, upon which he based his determinations, concluding "[n]othing in the claimant's clinical signs which reflect mild objective findings that include negative straight leg raise testing, tenderness of the lumbar and thoracic spinal regions, normal gait, decreased range of motion of the lumbar and cervical spinal regions, and mild weakness of the feet. . . suggest that these exertional and non-exertional limitations are unreasonable.  Nor does the medical record reflect a treatment regimen inconsistent with such limitations."  (Tr. at 19).  The ALJ plainly took into account the totality of Claimant's restrictions flowing from his severe and non-severe impairments, including pain and heart disease, and accounted for any consequential enhancement of functional limitations in the RFC finding.

Therefore, the Court finds that the ALJ properly discounted the opinions provided by Dr. Young in view of their lack of supportability and consistency with the totality of the evidence.  Further, the Court finds that the ALJ fully considered the issue of the medical equivalency of Claimant's combined impairments to the criteria set forth in the most applicable listed impairments.  As such, the ALJ's ultimate conclusion that Claimant's impairments did not rise to the severity level of any condition outlined in the Listing was supported by substantial evidence.

## VIII.  **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  May 25, 2011.

Cheryl A.  Eifert
United States Magistrate Judge